25-11-78, California Public Employees v. Palantir Technologies. Good morning, and may it please the court. My name is Luke Brooks, and I represent the Plaintiffs and Appellants California Public Employees Retirement System and Shijian Liu and the class. I'd like to reserve three minutes for rebuttal, if I may. This appeal asks whether the district court misapplied TELABS by evaluating Cyanar in a vacuum and resolving factual disputes in defendant's favor. The complaint alleges a strong inference of Cyanar from a set of allegations that, considered together as they must be, are classic. A quid pro quo revenue purchase SPAC scheme entered into as sales growth is floundering, a unique level of executive visibility, suspicious metric manipulation, and an unprecedented insider cash-out. These allegations are not hindsight. The complaint alleges a well-pleaded cash-out scheme with unusual transactions and unusual selling paired with defendant's knowledge of the truth while speaking. Defendants engaged in a coordinated course of conduct. They misrepresented Palantir's business model. They bought revenue to mask stagnation via the SPAC round-trip transactions, and they sold $2.2 billion worth of stock before the truth emerged. The district court split those allegations apart, excused them, and all but ignored the court's most on-point case pluralsight, and that was error. I'd like to start with the stock sales, which the court, the district court below, recognized as the most compelling indicia of Cyanar. As the Supreme Court stated in Telabs, personal financial gain may weigh heavily in favor, heavily in favor, of a Cyanar inference. There are few, if any, cases where the financial motive weighs as heavily as in this one. Each of the factors laid out in plural site and considered by this circuit for determining whether sales are suspicious goes in plaintiff's favor. The magnitude is the first one, and then we have, as I mentioned, $2.2 billion in sales. In plural site, they had massive sales, but it was 22 million, 22 and a half million, and that was for both the defendants. Here, Mr. Karp, who sold the most, unloaded more than a billion dollars in stock during the class period. That's more than 45 times the amount the court found suspicious in plural site. All of the selling defendants exceeded that plural site threshold. And it was Mr. Threshold in raw dollars or percentage of their holdings? Well, both, Your Honor. In raw dollars, it was Mr. Glazer who sold the least. He had the least amount of stock. He sold 63 million, which is almost three times as much. His percentage of sales, even including vested options, was 71.7. In plural site, the defendants sold 5% and 12%. What do you make, though, of the other inferences that could be drawn from the sale of stock here, including that it was deferred compensation for 17 years of building the company, that percentage-wise, there were residual stock units that don't factor into the percentage of the sales that were made. So how do we balance those against your presentation? Sure, Your Honor. I'll start with the restricted stock units and the unvested options, and those can't be sold. So securities that can't be sold shouldn't be considered. They couldn't be sold then or they could never be sold? Well, they couldn't be sold then, and that's what we look at. And in fact, the defendants, I think, rely on a case from the Ninth Circuit called Ronconi, and Ronconi indicates, yes, if there are vested options, we should look at them, but the court specifically says we look at securities that can be sold. Securities that can't be sold can't play into the analysis. They have no sort of persuasive or any basis in determining whether the sales are suspicious because they're out of the picture. They may vest at some point, they may become unrestricted at some point, but at that point, they can't sell them. But even, Your Honor, if you take the defendants' stock sales numbers or percentage numbers in this case, again, each of the defendants exceeds it, each of the selling defendants. I think Mr. Karp had 19% under their calculus. Others had 19%, and I believe Mr. Glazer had as high as 40%. So that's the ability to sell. The other question about liquidity is, first of all, Pluralsight rejected that argument in the context of that case where there was a 180-day lockup following the IPO. In this case, we're not talking about a sale of $50,000 for someone to pay their mortgage, sale of a million dollars for someone to put a down payment on an expensive house, sale of $5 million for someone to buy outright an expensive house. We're talking about a billion dollars, $700 million, $63 million at the lowest. So this question of liquidity does not answer why they sold all of these shares. The real answer here is that Mr. Karp had expiring options as of December 31st at the end of the class period in 2022. And so, after years of saying, we don't want to take this company public, it's going to be bad for our culture, he came up against that deadline. They took the company public, they made false statements and pumped up the stock, and then over a period of 13 months, sold. And the sales are 95% before the first corrective disclosure. So before the first piece of negative information comes out about the fraud, all of those sales are made. So counsel, you started with the stock sales. So can I infer from that, that maybe you think that's your best argument of scienter that was pled? Your Honor, I think all of our arguments are very solid. The stock sales sort of inform, look, this is a cash out scheme, so the stock sales are really important. The stock sales are, as I noted, unprecedented. And so, yes, they are one of our good arguments. So the district court's order referred to your allegations as group pleading, and you were, I mean, understandably why, but kind of dismissive of that critique in your briefs. But let's assume that we have that concern, that there is potentially some group pleading that occurred here. How can we see your allegations here to look to what individual defendants either knew, what they had, quote, strong visibility over, to conclude that there was adequate scienter here before they executed these stock sales? Sure, Your Honor. So admittedly, the complaint uses phrases like the individual defendants and defendants. We had a page limitation imposed by the judge. But each time we do that, we identify who those folks are, right? So when we have the defendants admitting to investors and proclaiming to investors that Mr. Karp and the other executives are heavily involved in sales, we identify who those executives are. So what you're saying is, yes, there was group activity because the sales were collective often. I mean, each individual sale was not collective, but I mean, it was part of others that were doing the same activity. But you then list the individual names of the people acting in that group. Your Honor, yes. What we identify is, for example, where we identify folks who attend town hall meetings. So we list the individual defendants who attend the town hall meetings and describe the information that they received. What we have when we have the strong visibility allegation, which is an admission by the defendants, which they made over and over and over again, and they said, we have strong visibility into our future revenues. Strong visibility and stability for future revenue growth. Strong visibility into future revenues across Palantir's customer base. And they're referring to Palantir and the executives. And different executives make this statement throughout different conference calls. And then in addition, other executives sign the 10 Ks and Qs where they identify the source of the strong visibility, which primarily is the ratable accounting that they do for their deals. Let me ask you a question. There are really two claims here. One is the big, broad claim of the SAS and the bespoke concept, the changing of whether the Palantir product is marketed to individual structure or generically to the market. And then the second is all these little corporations that they bought and plugged in. One of those, the first, seems to be policy arguments, a policy of what kind of product we want to sell. And I can see executives, all executives, would be involved in that kind of general policy. The second is an implementation issue where they were simply getting, they're buying little subsidiary companies in order to effectuate actual sales. I can see why senior executives might not know that. Is there any usefulness of drawing a distinction between those two claims and attributing the executives greater knowledge and responsibility to general principles, which you could assume any principal, any executive should know, and implementation, which you could not assume individual executives would know? Well, I think that there is value to that, Your Honor, but I would push back on the inference that the senior executives would not know about these SPAC deals. They're speaking on conference calls about the deals. The deals are- Well, if you show, if you planned and showed an individual executive in these deals to get these subsidiary companies in, then that would be unique, specific knowledge as to that executive. What I'm saying is, absent that kind of knowledge, you couldn't just assume that an executive would know those things. Well, we're not asking anyone to assume, Your Honor, but we have allegations, we have specific allegations that Mr. Glazer, the CFO, performed due diligence on the Fast Radius company. But you use that word due diligence, but it's not always clear to me from the complaint what you meant by that. Did that mean he was in the weeds and knew about all of these SAS companies or not? Your Honor, what we allege is that the defendants knew about all these SAS, all these SAS SPAC companies, yes. What it means specifically with Fast Radius is that Mr. Glazer went in, performed due diligence on the company, so before they gave the company money and the company agreed in turn in this round-trip transaction to provide money back, he went in and looked at the financials. And the inference that we draw from that, Your Honor, is the company went bankrupt nine months later. And so, I see that I'm already at three minutes. You've answered my question, that's fine, thank you. I'm sorry? I'm done, you go ahead, whatever you wanna do. But I'm satisfied with your response. I'll reserve the remainder of my time for rebuttal. You may do so. May it please the court, Boris Feldman for the appellees. The beauty of preparing for an appellate argument is you get to go back and reread some of the key documents. So I had the pleasure last night in the Brown Palace of rereading the complaint. And there are a couple passages in the complaint that synthesized the entire case for Your Honors. At page 64, and this is really the whole case, quote, defendants falsely assure investors that Palantir was positioned to achieve 30% long-term revenue growth, close quote. And then in the paragraph right after that, paragraph 157, the complaint says defendants lied when they projected that, quote, Palantir would break $4 billion in annual revenue by 2025, close quote. So that's the heart of the case. Did they lie about that? Or was that the truth? So revenue in the quarter that was included in the registration statement. Q2 2020 was 252 million. The most recent quarter, Q4 of last year, 1.41 billion. Why does that matter? It matters because what plaintiffs have done is said the whole theory of the case is that the insiders bailed out because they knew there was no future. They used terms like that, and they're wrong. They looked at an artificial time, but in fact, the company thrived and did better than they had indicated to the market. Similarly, I don't mean to keep you from. Well, I'm not sure I accept the first point you made about what their allegation is about. I read their allegation to be that those who had equity shares in the company didn't sell out because they thought there was no future, but in the near term, they saw an opportunity to pump up the price, they called it a pump and dump, to try to maximize at a point where they knew they were gonna sell out, but doesn't say anything about necessarily their views on long-term growth. But I guess what I'm getting at when I ask why does it matter, aren't we only looking at the class period here? No, I think there would be an artificial way of looking at their allegations, Your Honor. What they say in their opening brief at page five is that defendants, quote, exploited, quote, unsustainable pre-IPO results, that the revenue was, quote, inflated by temporary, non-recurring COVID-related contracts, and then on page 12 of their opening brief, a temporary boost from short-term contracts that was neither sustainable nor representative of actual growth potential. So the complaint is about actual growth potential. You can't just look at one quarter here or there and say, well, they had a down quarter, so security is fraught. In fact, if you go up to the 10,000-foot level, which is part of the holistic analysis required by Tell Labs and Smolin and all the other decisions in this court, what you find is that the plaintiffs allege that they falsely assured investors that they would achieve 30% long-term revenue growth. They actually achieved 37%, well above that. The plaintiffs say that Palantir lied when it said it would break $4 billion in the annual revenue by 2025. That's paragraph 157 of the complaint. In fact, they achieved $4.75 billion. So it's not to suggest that a company gets a pass in a security suit if it does well later. But here, the entire theory of the case is you bailed out because you had a lot of visibility into your business and you were on top of it, and you realized that you were running out of steam and you had to unload your money. The final point on their performance, then I'll move on to Sienter, Your Honors. By the way, in 2024, Palantir, which replaced American Airlines and the S&P 500, was the number one performer. It doesn't really sound like a company that was running out of steam after 17 years so that people had to pump and dump. Certainly for the lead plaintiff here, which is the California Public Employees Retirement System, their stock, they own 3.4 million shares. It's a big holding at the end of the class period. The weighted price of that was $22.89 a share. They paid about 78 million. And as of the date of Palantir's reply, October 21, those shares were worth $620 million. That's a 694% return. So let me now turn to Sienter. And I appreciate Your Honor's skepticism about how well the company has done, but in a way, it is hypothesis testing. Okay, the standards here, Judge Ide knows the Smolin decision because she was on the panel. That's kind of the law on the 10th Circuit, implementing the Supreme Court on Sienter in a Reform Act case. And there are two theories that Your Honors are all over. One is lots of stock sales. It is worth noting what is not in their complaint or in their Sienter theory, because at least two of you have been on many securities appeals, and I know that Judge Federico will be. Usually you have a boatload of CWs or FEs, confidential witnesses or former employees, who are saying, well, at the date they said this, they actually knew that. None of that here, not one. Second, typically you have some kind of restatement, especially here where they say, these were fake deals, these SPAC deals. They were pump and dump. You'd expect a restatement at some point. No restatement ever. No internal documents contradicting. The plaintiffs love pluralsight because it was a very rare reversal in this circuit of a dismissal of a securities case. But in pluralsight, the CEO admitted that he'd lied. He said 250 sales reps at the beginning of the year, and then later he said, well, it was 200. They had said, we'll get to 300 by the end of the year. I may have that wrong. It may be that he said 300 and it was 250, but later the confession was, it wasn't that number. Here we have nothing like that. The company didn't retract anything they said. So in the stock sales, as Smolin said, 950 F third at 1310, it's about suspicious timing, not wealth. If people who create these companies can make a lot of money, say $620 million for CalPERS, on their $78 million investment, they're entitled to make some money too. There is no basis for saying it was a pump and dump. Your honors have probably all seen pump and dumps where everything's going great at the company, the insiders get rid of their stock, and then the company goes bankrupt. That's a classic pump and dump. Here, in the aggregate, the defendants retained 80% of their equity stake during the class period. They sold about 20%. That's in appendix six at 204 in addendum, which is the opinion below it. Does that include the restricted stock units? It does, absolutely. If your honor did just sort of, if you went to one of the AI programs and said, what is the consensus among federal courts as to whether in analyzing stock sales in the securities case for Sienter, you should look at their overall economic interest or only shares that are vested? I think a very fair reading would say you look at their vested and unvested shares and RSUs, because if you're a founder and a CEO of a company, and you're trying to say, okay, we're gonna go public now, we can get some liquidity, what are we holding long-term and what do we get rid of now? You look at that overall interest and the law very clearly backs me up on that. Well, if I went to the AI program, I wouldn't believe what it told me, but either here or there. Well, actually, your honor, I did a test today among three. Remember, their theory is this company was running out of steam and was about to fail. So I went into three different AI programs, because I didn't want to favor one that was at a client of ours. So I went into CHAT GPT, I went into Gemini, and I went into Claude. I feel as if I'm on a first name basis with them now. And my prompt was, what are the largest US software companies by market cap today? Remember, it was a pump and dump because they were out of money after COVID, no more work. On one, Palantir was number three. On one, it was number five. And on one, it was number six. Counselor, can I ask you another question about stock? Please. The timeline, as I understand it, is July 2020. They announced they're going public. It goes public on September 30th, I think. But there's references in the brief to an August 2020 stock awards that are given to now the defendants. But it's not really explained the context of those awards or why their significance. Can you help me understand those? Were those prior compensation? Or why does that come up in the brief so much? And again, to me, it's kind of out of context. I think, if I may, I think it's not important to the case. It is typical, but I'm not an expert witness. It is typical that just before a company goes public, it does additional stock grants going forward so that it will incentivize the people post IPO. But I don't think in this case those grants in August matter. What really does matter, and I'm glad your Honor reminded me, the first SPAC deal is six months after they go public. So for the whole, you're in reality testing mode under Tell Labs and Western Union. And so you want to say, well, okay, they say they came up with all this as a pump and dump. But at the time of the IPO, which is when most of the sales occurred, there were no SPAC deals. Those were six months later. So the story doesn't fit. Let me turn, since I, pardon me, I only have three minutes. Let me turn to the SPACs. What's most important about this is they disclosed every detail about each SPAC investment, and they never adjusted the accounting. So you know from all your securities cases. Did they disclose that most of these SPACs had never had any business? They had absolutely no use for the product that Palantir was selling, and that they bought things that way, way exceeded their ability to make them financially pay off. Yes, they did, your Honor. Appendix volume three at pages 609 and 612. That was their earnings call where the management talked to the street about the SPAC investment. Can you give me that slide again? Yes, your Honor. Appendix volume three, page 609 to 612. They disclosed, quote, the high risk, high reward strategy of investing in and working with day zero companies. Yeah, but I mean, that generality doesn't, I don't think that is equivalent to saying these are shell companies that have no interest in this product whatsoever. Oh, respectfully, your Honor, you just took the allocations way beyond what anything in the complaint shows. I thought that was the allegation. To say that they, no, they said they weren't very good, and they agreed to buy stuff from you because you were investing in them. Everybody knew that these SPAC companies were very young. Some of them were public, though. So the notion that these weren't real companies, some of them. No, no, they were real companies, and the fact that they went public was one of their asset values. But my understanding was that it was not disclosed that they really had no interest in that product, and yet it was being portrayed as a source of real interest in the products that Palantir was selling, this activity. The allegations don't support that, and Judge Gallagher discussed that at length. There's no basis for concluding they didn't want the Palantir products. There's no articulation of that. And in fact, if you look, and if that were the case, that they didn't want the product, you would have expected them to have to restate the revenue that they booked from it if it's not real revenue. But in fact, there was no restatement on a single SPAC transaction, and the magnitude, Your Honor, was trivial for the entire class period, all those years. The revenue recognized from all these SPAC transactions was 4% of total revenue. The traditional benchmark materiality, maybe 5%, whatever, these hit 4%. Total SPAC revenue in that period was 119 million versus total revenue of 2.9 billion. These were rounding errors. Similarly, I'm sorry, I'm almost out. I want to say one other thing. The investments in the SPAC companies didn't pan out. Absolutely. Palantir's investment at the same time in AI did pan out, and that's why they were the leading company in the S&P 500. So you-  Your time has expired. Thank you, Your Honors. Your Honors, I'd like to start by just briefly addressing my colleague's summary of our complaint, which he boils down to 30% future growth. There is an allegation that those projections were unsupported when they were made, but it certainly is not the core of our complaint. And I will point out also that the statements that they made weren't simply, we'll get to X point in 2024 or 2026 or 2028, but we expect greater than 30% annual revenue growth each year for the next five years. Of course, they didn't achieve that in 2022, and that's one of the reasons that the stock price declined. But I think the more key point here is the point that Judge Federico made, which is that this was a specific place in time, and they had a deadline to sell these securities, and they could have sold them based on what the company was actually doing during that timeframe, or they could have pumped it up, lied about their capabilities, engaged in the SPAC scheme, et cetera, and they chose the latter. And this court in level three, which was a case that defendants have cited, cited favorably the Eighth Circuit's decision in Greentree. And I just want to read from that because the facts are pretty similar in this context of a certain timeframe. The court observes, defendant who was the highest paid business executive in the entire United States in 1995 and 96 had a legally significant motive because the amount of his compensation was based on a percentage of Greentree's pre-tax earnings, and his contract was set to expire at the end of 1996, making it urgent for him to maximize Greentree's earnings for the year. And that's exactly what happened here. It was not comp, it was options. Those options were expiring. And the performance that my colleague sort of elides here is that they went from about $9 a share up to 45 during the class period, and back down to seven. Had my client purchased those shares at $7 a share, they would have had way more shares than they purchased. That's the point of these class actions. We look to see whether the stock was inflated when folks purchased, and if it was, they're entitled to the difference between the amount that they purchased and the amount that they sold, with a statutory restriction. The only way that the statute allows for post-class period facts to come into play is within the 90-day look back in the PSLRA. It's statutory, that's what Congress decided was appropriate to look at, not what's happened four years later. And I see I've run out of time. Thank you. Thank you. Thank you, Council. You are excused, case is submitted.